2024 IL App (1st) 232406-U
Order filed June 13, 2024

FOURTH DIVISION

No. 1-23-2406

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.C., Jr., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 19 JA 239 |
| | ) | |
| v. | ) | |
| | ) | |
| A.W. and J.C., Sr., | ) | Honorable |
| | ) | Levander L. Smith, Jr., |
| Respondents-Appellants). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In this abuse and neglect case, we granted the motion to withdraw of the mother's appointed appellate counsel, rejected the father's arguments that the court's finding that it was in the best interest of his son that parental rights be terminated and his trial counsel was ineffective and affirmed the order finding the mother and the father were unfit to parent and terminating their parental rights.

¶ 2    Respondents-appellants, A.W. (the mother) and J.C., Sr. (the father) appeal from the order

of the circuit court which found that they were unfit to parent their son, J.C., Jr., and it was in the

best interest of J.C., Jr. to terminate their parental rights and appoint a guardian with the right to consent to his adoption. The Office of the Cook County Public Defender, the mother's appointed appellate counsel, has filed a motion for leave to withdraw pursuant to *Anders v California*, 386 U.S. 738 (1967), and a brief in support of the motion. We grant the motion to withdraw of the mother's appellate counsel and affirm the order of the circuit court as to both the mother and the father.

¶ 3    J.C., Jr. was born on September 30, 2015; the mother and the father were unmarried but living together. During the proceedings, the circuit court entered an order which established the father's paternity as to J.C., Jr. based on genetic testing.

¶ 4    In 2018, the Department of Children and Family Services (DCFS) became involved with the family due to incidents of domestic violence between the mother and the father. Both the mother and the father were indicated for risk of harm. Based on a January 31, 2019 integrated assessment (IA), DCFS recommended that the mother and the father engage in intact family services; they refused to participate.

¶ 5    On March 14, 2019, the State filed a petition for adjudication of wardship and a motion for temporary custody of J.C., Jr. under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 *et seq*. (West 2018)). In its petition, the State contended that J.C., Jr. was neglected and abused due to an injurious environment (*id.* § 2-3(1)(b)) and substantial risk of physical injury (*id.* § 2-3(2)(ii)) based on the following factual allegations:

"[The] mother has three and [the] the father two prior indicated reports for substantial risk of physical injury/environment injurious and inadequate shelter. [The mother] has two other minors not in her care or custody. On or about August 17, 2018, [the] mother and [the] the father were involved in a domestic violence incident wherein [the mother] struck

[the] the father in the face in the presence of [J.C., Jr.]. [The] mother reported that on December 26, 2018, [the] the father struck her in the face causing a bruise. On January 10, 2019, [the] the father reported that [the] mother struck him and [J.C.,Jr.] with a stick. [The] the father reports a history of being diagnosed with bipolar disorder and schizophrenia for which he is not taking prescribed medication. [The] mother reports being diagnosed with bipolar disorder and depression and also reports not taking prescribed psychotropic medication. [The] mother and [the] the father have been non-compliant with intact family services and with DCFS attempts to assess the safety of the home and well-being of [J.C., Jr.]."

¶ 6    The State submitted the affidavit of DCFS investigator Toni Dunlap in support of the above factual allegations. In addition, Dunlap averred that the mother and the father have "not made themselves available to have [J.C. Jr.'s] current safety assessed," and J.C., Jr. was at risk of harm if he remained in the care of the mother and the father.

¶ 7    On that date, the court entered orders which granted the motion for temporary custody and ordered that J.C., Jr. be removed from the care of the mother and the father and DCFS be granted temporary custody, appointed the Cook County Public Guardian as the attorney and guardian *ad litem* for J.C., Jr. and allowed the mother and the father supervised day visits under specific conditions including compliance with any requests and referrals by DCFS. On June 11, 2019, J.C., Jr. was placed in the care of A.C., his paternal grandmother (the grandmother).

¶ 8    The circuit court, on June 18, 2019, entered an adjudication order finding J.C., Jr. had been abused or neglected based on an injurious environment which resulted from the history of domestic violence between the mother and the father "with [J.C., Jr.] present" and their refusal to engage in

intact family services. The order also found that the abuse or neglect was inflicted by "both parents."

¶ 9    Subsequently, on October 2, 2019, the circuit court entered a series of orders. In a disposition order, the court found the mother and the father were unable to care for and protect J.C., Jr., for some reason other than financial circumstances; reasonable efforts had been made and appropriate services had been offered to achieve reunification but had been unsuccessful; and it was in J.C. Jr.'s best interest that he be placed in the custody and guardianship of DCFS. In a permanency order, the court set a goal of return home within 12 months and stated the mother and the father had made some progress toward this goal and were having supervised visits with J.C., Jr. And in visitation orders, the court allowed the mother and the father only supervised day visits at the discretion of DCFS with directions that they continue to engage and make progress in services.

¶ 10    On June 22, 2021, the court entered a permanency order which changed the goal to private guardianship. In the order, the court explained the reasons for the goal change. J.C., Jr. was now five years old and has been in the care of the grandmother who is willing to adopt him but prefers guardianship. Although the mother and the father had been engaged in some services and supervised visits, they have not made "the necessary progress for return home."

¶ 11    On January 4, 2022, the circuit court held a permanency hearing. At the request of the GAL and without objection the court admitted the September 10, 2021 service plan and a psychological evaluation for J.C., Jr. into evidence.

¶ 12    Rodney Patterson, the DCFS caseworker for the family since November 30, 2021, testified that J.C., Jr., now 6 years old, has been in the care of the grandmother since 2019 and the placement is safe and appropriate with no signs of abuse or neglect. The grandmother wishes to pursue

guardianship. The psychologist's evaluation showed that J.C., Jr. has a high I.Q., was diagnosed with other specified trauma and stressor-related disorder and his exposure to domestic violence has resulted in his aggressive behavior. The evaluation recommended that he continue to participate in trauma-based therapy and be placed in gifted classes.

¶ 13    The mother and the father remain in a relationship and living together. The mother has been diagnosed with bipolar disorder and the father has been diagnosed with depression and bipolar disorder. They report that they are now compliant with their medications and engaged in therapy. The mother and the father are participating in visits with J.C., Jr. under the grandmother's supervision without complaints.

¶ 14    DCFS recommended maintaining a goal of private guardianship. On that date, the court entered a permanency order with that goal.

¶ 15    At a July 22, 2022 permanency hearing, Patterson testified that J.C., Jr.'s placement with the grandmother continues to be safe and appropriate. The grandmother now wishes to adopt him and has obtained the necessary license. The mother and the father continue to live together and have incidents of domestic violence. Their visits were suspended in June 2022 because they were fighting in front of J.C., Jr. They fought on the day of his graduation from kindergarten. J.C., Jr. once called the police because he feared the father "was hitting—fighting" the mother. The mother and the father have been verbally abusive to the grandmother and have encouraged J.C., Jr. to do so. On July 7, the grandmother obtained an order of protection against the father and no longer wishes to supervise visits. DCFS will reinstate visits, supervised by DCFS, when the mother and the father have re-enrolled in a domestic violence program and provide proof that they are engaging in individual therapy. The mother and the father have not completed all of the recommended services. J.C., Jr. has stated that he wants to stay with the grandmother and that he

is concerned the father is "still hitting" the mother. DCFS recommended termination of parental rights and adoption.

¶ 16    The grandmother testified that that she now believes adoption is best for J.C., Jr. because of the continued fighting between the mother and the father and its negative impact on J.C., Jr.

¶ 17    At the end of the hearing, the court concluded that the permanency goal should be changed to substitute care pending termination of parental rights (TPR). The court entered a permanency order which reflected this goal change and the court's reasoning. The order stated that J.C., Jr. did not wish to return to the care of the mother and the father who still require services, continue to fight in his presence and have had their visits with him suspended. The order also indicated that the grandmother was willing to adopt J.C., Jr.

¶ 18    The court held a status hearing on January 26, 2023. Patterson testified that the grandmother was still willing to adopt J.C., Jr. The grandmother was present at the hearing and confirmed that she understood the differences between guardianship and adoption and had decided on adoption back in June of 2022.

¶ 19    On that date, the State filed a motion for the appointment of a guardian with the right to consent to adoption. The State alleged that the mother and the father were unfit to parent J.C., Jr. under section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2018)) and section 1(D) of the Adoption Act (750 ILCS 50/1(D)) for failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of J.C., Jr. (ground (b)) (*Id.* § 1D(b)) and make reasonable efforts to correct the conditions which were the basis of J.C., Jr.'s removal from their care or make reasonable progress toward his return during any nine-month period following the adjudication of neglect or abuse (ground (m)) (*id.* § 1D(m)). The State later filed a pleading setting

forth the time frames for the ground m claim as the five nine-month periods between October 2, 2019 and January 26, 2023.

¶ 20    At a May 23, 2023 permanency hearing, Nichole Dorsey testified that she was assigned as the caseworker for the family on April 28, 2023. She visited the grandmother's home on May 11 and found it safe and appropriate. The grandmother and J.C., Jr. are bonded and demonstrate love for each other. The mother was not compliant with medication. The mother and the father have not completed services and their visitations with J.C., Jr. remain suspended. The grandmother is committed to adoption. DCFS continues to recommend TPR.

¶ 21    In a permanency order of that date, the court maintained the goal of TPR for the reasons that J.C., Jr. was still in the care of the grandmother who wished to and was "willing to provide permanency in the form of adoption." Further, the mother and the father had not made substantial progress with services which had been recommended for reunification.

¶ 22    The termination proceedings were held on September 11 and December 1, 2023 and began with a fitness hearing. At the outset of the hearing, the court, at the request of the State and without objection, admitted and considered a group of records pertaining to whether the Indian Child Welfare Act (ICCWA) (25 U.S.C. § 1901 *et seq.* 2022)) had application to the case in that the father had claimed possible Native American ancestry. Based on those records which established that J.C., Jr. does not meet the definition of an Indian child under the ICWA, the court entered an order finding that the statute was not applicable.

¶ 23    Additionally, at the request of the State and without objection, the court took judicial notice of the paternity finding and disposition, adjudication, permanency, and visitation orders and the State's pleadings relating to the motion to appoint a guardian with the right to consent to adoption. The court also admitted into evidence without objection the State's exhibits which included service

plans from March 2020 to September 2023, the service provider records for the mother and the father, and the IA.

¶ 24    The State first called three members of the Chicago Police Department: Officer David Arauz, Sergeant Munro Mendoza and Officer Michael Alverio as witnesses to testify about domestic violence incidents involving the mother and the father which occurred during the pendency of this matter over the relevancy objection of the mother.

¶ 25    Arauz, in August 2019, investigated a domestic battery call at the home of the mother and the father. The mother reported that the father struck her in the face multiple times and choked her "to the point where she lost consciousness." She complained of neck pain and was transported to a hospital by ambulance. To the officer's knowledge, no charges were filed. Subsequently, in July 2021, Mendoza, when assisting with a domestic call, observed the father with a cut on his lip. The mother was arrested for domestic battery. However, the father would not sign the complaint. Alverio was dispatched to a domestic battery call in March 2023; the father reported that he had been battered by the mother with whom he had been drinking. The father appeared to be intoxicated; he was aggressive and non-cooperative and had slurred speech. The mother was not on the scene and no charges were filed.

¶ 26    The State next called Brenda Curtis, the DCFS caseworker for the family from 2019 to the end of 2021 who testified to reviewing the IA and preparing several service plans. Pursuant to the recommendations of the IA, she referred the mother and the father for individual and family behavioral therapy, parenting classes, domestic violence services, and a mental health and a drug and alcohol assessment. She explained the referrals to the mother and the father and the importance of completing the services.

¶ 27 The mother was not consistent with individual or family therapy, and Curtis was never informed that she completed either service. The mother did complete parenting classes and her first referral to a domestic violence program. The mother was re-referred for a drug and alcohol assessment, and Curtis could not recall if she completed this assessment or the mental health assessment.

¶ 28 The father did not complete individual therapy and did not engage in drug and alcohol and mental health assessments. Curtis did not recall whether the father completed family behavior therapy. He did complete parenting classes and his first referral to domestic violence services.

¶ 29 During her time as case worker, the mother and the father were allowed weekly visits which they usually did together under the supervision of DCFS. During one visit, in September 2020, the father became "irate and sort of—a lot of yelling." The father believed a DCFS employee was looking at the mother and "disrespecting him." In October and November 2020, the mother and the father did not come to two scheduled visits. Both times, J.C., Jr. was already at the site of the visits; the visits were cancelled because the mother and the father could not be reached. In July 2021, during a remote team meeting, the father was hostile towards Curtis and accused her of not helping the family to reunite. Curtis never recommended unsupervised visits or J.C.'s return to the care of the mother and the father because there were outstanding services and continuing "domestic violence in their relationship" and they do everything together, so there is no separation between the two." On cross-examination by the mother, Curtis acknowledged that the mother attended most visits, most of those visits went well and J.C., Jr. "loved seeing" her.

¶ 30 Patterson, the family caseworker from the end of 2021 to March 2023, also testified to having reviewed the IA and prepared service plans. In the March 2022 service plan, he rated the mother and the father unsatisfactory for individual therapy, psychiatric treatment, and medication

monitoring. In the September 2022 service plan, the mother and the father were rated unsatisfactory again for the same services. At that time, they were again referred to a domestic violence program because Patterson and his supervisor "felt that domestic violence may still be occurring."

¶ 31    When Patterson was the caseworker, respondents had supervised visitations at least monthly and attended most visits together. In February 2022, Patterson supervised a visit at the mother and the father's home that went well until J.C., Jr. was reluctant to leave. Patterson told J.C., Jr. that it was time to go, and the father "became very angry" and would not let J.C., Jr. leave until Patterson threatened to call the police. Patterson and his supervisor then decided that visits would no longer occur in the mother and the father's home. In June 2022, visitation was suspended until the mother and the father completed domestic violence classes and documented receiving psychiatric care and taking their medication. They were willing to receive psychiatric care and medication but not to attend domestic violence classes. When Patterson left the case in March 2023, he could not recommend that visitation be reinstated because he had not received documentation of the mother and the father's completion of domestic violence classes or their compliance with psychiatric care and medication.

¶ 32    The grandmother testified that she supervised some of the visits in her home. The mother and the father always visited together, and often would arrive significantly late and try to extend afternoon visits late into the evening.

¶ 33    During a June 2020 visit, the mother and the father arrived three hours late with an unfamiliar woman and a young child, which concerned the grandmother because of the Covid pandemic and the woman seemed "high." At the end of the visit, the mother tried to take J.C., Jr. with them until the grandmother threatened to call the police. During a visit in July or August

2020, the mother and the father argued, and J.C., Jr. "jumped between" them and told them to calm down. The father pushed J.C., Jr. aside. The grandmother stopped having the visits but "gave them another chance." The mother and the father were angry during the "next couple visits," so the grandmother asked the agency to supervise visits.

¶ 34 The grandmother explained that she resumed supervising visits in September 2021 but stopped in June 2022 due to two incidents that month. The first incident was on the day of J.C.'s preschool graduation, before which the grandmother warned them not to argue. As the mother, the father, J.C., Jr., the grandmother, and others waited for a table at a restaurant after the graduation, the mother yelled at the father that she was tired of him beating her for 13 years and she had nearly lost an eye. J.C., Jr. ran towards the mother., but the grandmother and others prevented him getting "in the middle of it." At a party after dinner, the father again became angry, and the grandmother ended the party.

¶ 35 The other incident was on Father's Day, when on a video call, the mother and the father asked the grandmother if they could take J.C., Jr. downtown. She said no because she would have to supervise the visit but did not feel well. The father became "very angry," told J.C., Jr. that she was not his grandmother, and told the grandmother that he would kick in her door and take J.C., Jr. The father did not come to the grandmother's house, but J.C., Jr. called the police because he was "scared for" the mother and wanted the police to check on her well-being. The grandmother obtained an order of protection against the father in July 2022.

¶ 36 When supervised visits again resumed in October 2023, the mother and the father gave J.C., Jr. a cell phone which they used to keep in contact with him. J.C., Jr. would try to talk with the mother and the father outside the grandmother's presence. After these calls began, J.C., Jr.

became defiant with the grandmother and reluctant to do his homework. After about a week of calls, the grandmother ended J.C., Jr.'s access to the cellphone.

¶ 37    Dorsey, the caseworker from April 2023 onwards, testified that the mother was still in need of completing services including domestic violence, individual therapy, psychiatric and drug and alcohol services. The father was not in full compliance with domestic violence services, individual therapy and drug and alcohol treatment. The mother and the father were still in a relationship.

¶ 38    Visitation had been suspended when Dorsey took over the case, but monthly supervised visits resumed in June 2023 because of the goal change to TPR. Based on Dorsey's own observations as she supervised visits, she could not recommend unsupervised visitation. During visits, J.C., Jr. threw tantrums and "[i]t was kind of hard for [the mother and the father] to maintain his behavior." Dorsey also saw J.C., Jr. in the grandmother's home monthly and he did not throw tantrums there.

¶ 39    In November 2023, she phoned and talked to the mother and the father about the grandmother's concerns over the cellphone and a tablet that they gave J.C., Jr. They were "irate," and Dorsey ended the call "due to the level of disrespect and unprofessionalism that they were giving me." The court overruled the mother's objection that the testimony related to events which took place after the start of the termination hearing. The State argued that the testimony was relevant to the ground (b) claim.

¶ 40    In its closing argument, the State referred to portions of the admitted records from the service providers which showed the mother's inconsistent participation in therapy, a therapist's concerns that the mother was being controlled by the father and did not understand the impact that domestic violence has on J.C., Jr., and incidents when the mother and the father had arguments

during a therapy appointment. The State also directed the court's attention to the service plans which showed the mother's and the father's unsatisfactory progress in services.

¶ 41    Following arguments, the court found the mother and the father unfit to parent J.C., Jr. based on a lack of a reasonable degree of responsibility (ground (b)) and failure to make reasonable efforts to correct the conditions which were the basis for the removal of J.C., Jr. from their care and reasonable progress toward his return during the specific time periods alleged by the State (ground (m)).

¶ 42    The court then commenced a best interest hearing. To begin, the court, at the request of the State, took judicial notice of the evidence and testimony from the fitness hearing.

¶ 43    Dorsey testified that J.C., Jr., now 8 years old, has been in the grandmother's care since 2019. The grandmother's home was safe and appropriate with no signs of abuse or neglect and no unusual incidents. His medical, dental, vision, and hearing appointments and requirements were up to date. During her monthly visits to the home, Dorsey observed that the grandmother and J.C., Jr. have "a loving deep-rooted connection" and are "[v]ery close kin." During her last visit to the home in November, she spoke to J.C., Jr. alone, he did not report any issues with the grandmother and expressed his desire to stay with her.

¶ 44    J.C., Jr. was in second grade, "a straight A student," and being tested for a gifted program. In 2021, he was diagnosed with a trauma-and stress-related disorder and received therapy for four years. Dorsey planned additional therapy for J.C., Jr. because the grandmother believed it was needed, as his behavior changed after visitation with the mother and the father resumed. Dorsey had no concerns about the grandmother's plan to adopt J.C., Jr. Based on a staffing, DCFS concluded that it was in J.C.'s best interest for parental rights to be terminated and recommended that he be adopted "[d]ue to the length of the case," the mother's and the father's lack of "necessary

reasonable efforts to *** change their lives around for" J.C., Jr. and his stable life with the grandmother.

¶ 45    On cross-examination by the mother's attorney, Dorsey testified that J.C., Jr. loved the mother but did not ask about her. The father's attorney did not cross-examine Dorsey.

¶ 46    The grandmother testified that when J.C., Jr. first was in her care, she hoped the mother and the father "would complete services" and he could return to them. After the problems during the preschool graduation, she concluded that it would be best for J.C., Jr. if she adopted him and she was committed to that goal. The grandmother thought the mother and the father should have been further along with services and they were fighting with each other and with her.

¶ 47    She described J.C., Jr. as caring, intelligent, and generous. He enjoys singing and dancing; they play board games and go to movies. He is teaching her Spanish. She believes he is "college material" and she wants him "to stay that way." J.C., Jr. is connected with his uncles and other members of the extended family.

¶ 48    After visitation with the mother and the father resumed in 2023, J.C., Jr. became rebellious and stubborn, and did not want to do his homework, so she arranged with his former therapist to resume therapy. She had concerns about maintaining J.C.'s relationship with the mother and the father should their parental rights be terminated, due to the "negative things" they were saying to him that she felt were contrary to her parenting style and goals. That said, she understood the importance of a relationship between J.C., Jr. and the mother and the father and she was open to maintaining visits if J.C., Jr. wanted them.

¶ 49    On cross-examination, by the mother's attorney, the grandmother acknowledged that J.C., Jr. loves the mother and the father and asks about the mother "sometimes." The grandmother, who

was 67 years old, had a backup plan for the care of J.C., Jr. if she could not, including his godmother, who is 33 years old and a nurse, and an uncle.

¶ 50    The father's attorney did not conduct a cross-examination of the grandmother. In closing argument, the father's attorney simply asked the circuit court to "make a finding that is in [J.C.'s] best interest."

¶ 51    Following the arguments, the court found it was in the best interest of J.C., Jr. to terminate the parental rights of the mother and the father and to appoint a guardian with the right to consent to his adoption. The court entered a termination hearing order finding the mother and the father unfit based on their failure to maintain a reasonable degree of interest, concern, or responsibility as to J.C., Jr.'s welfare; failure to make reasonable efforts to correct the conditions which were the basis of J.C., Jr.'s removal; and failure to make reasonable progress toward his return in all five nine-month periods between October 2, 2019 and January 26, 2023. 750 ILCS 50/1(D)(b), (m) (West 2022). The order terminated their parental rights and placed J.C., Jr. in the custody of the DCFS guardianship administrator with the right to consent to his adoption. In a permanency order, the court set a goal of adoption.

¶ 52    A timely notice of appeal from the termination hearing order was filed *pro se*. The notice listed the mother and the father as the appellants with their addresses and telephone numbers and the signature of the mother only. Separate appellate counsel were appointed for the mother and the father.

¶ 53    Initially, we set forth the legal framework for our review of the termination hearing order. The Juvenile Court Act provides a "step-by-step process used to decide whether a child should be removed from his or her parents and made a ward of the court." *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary

custody, the circuit court must first make an adjudicatory finding of abuse, neglect, or dependence, before it then conducts a dispositional hearing to determine if it is in the minor's and the public's best-interests that the minor be made a ward of the court. *Id.*; 705 ILCS 405/2-21(1), (2) (West 2016).

¶ 54 The Juvenile Court Act also provides a two-step process to involuntarily terminate a parent's rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). After a court finds a parent unfit, it determines whether it is in the minor's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 55 The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the trial court regarding credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 56 At the second stage of the termination proceedings, the issue is "no longer whether parental rights can be terminated; the issue is whether, in light of the child's needs, parental rights should be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "Although the

parent still possesses an interest in maintaining the parent-child relationship, the force of that interest is lessened by the court's finding that the parent is unfit to raise his or her child." *Id.* "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* A decision to terminate parental rights in the best interests of the child must be supported by the preponderance of the evidence. *Id.* at 366.

¶ 57    " '[O]nce a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.' " *Id.* (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). However, the trial court cannot rely solely on fitness findings to terminate parental rights. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Instead, pursuant to section 1-3(4.5) of the Act, "[t]he court is required to consider factually based statutory factors, separate from those considered during parental fitness hearings, which focus upon 'the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2000)).

¶ 58    Those statutory factors include the physical safety and welfare of the child, including food, shelter, health, and clothing; the development of the child's identity; the child's background and ties, including the familial, cultural, and religious ties; the child's sense of attachments (which includes where the child actually feels love, attachment, and a sense of being valued; the child's sense of security; the child's sense of familiarity; the continuity of affection for the child; and the least disruptive placement alternative for the child); the child's wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; the uniqueness of every family and child; the risks attendant to

entering and being in substitute care; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 59    The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 60    While all these factors must be considered, no single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. In addition, the trial court's best-interests determination need not contain an explicit reference to each of these factors, and we need not rely on any basis relied upon by the trial court in affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will not reverse the trial court's judgment as to termination unless it is against the manifest weight of the evidence. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. The trial court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20.

¶ 61    As to the mother's appeal, the office of the Public Defender of Cook County was appointed to represent her. Counsel has filed a motion under *Anders v. California*, 386 U.S. 738 (1967), requesting leave to withdraw based on their conclusion that there are no meritorious issues to raise on appeal. See *In re J.P.*, 2016 IL App (1st) 161518, ¶ 8 ("*Anders* *** provides the correct procedure where counsel seeks to withdraw from representation on direct appeal from orders affecting parental rights under the [Juvenile Court Act of 1987].""). Counsel has informed the mother of their conclusion and has filed a brief in support of the motion. The brief identifies arguments that the mother could potentially assert on appeal and explains why the arguments are without merit. We summarize the issues and legal authority counsel considered in reaching these conclusions.

¶ 62 Counsel considered whether the court erred in finding the ICWA inapplicable. Citing *In re F.O.*, 2014 IL App (1st) 140954, counsel discounted that contention due to evidence, from tribes responding to notices sent by the State, that J.C., Jr. was not an Indian child under the ICWA.

¶ 63 Counsel considered whether the court erred in taking judicial notice of its earlier proceedings and decisions in this case. Citing a statute expressly authorizing such judicial notice (705 ILCS 405/2-18(6) (West 2022)), counsel discounted such a contention.

¶ 64 Counsel also considered whether the court erred in its rulings on the mother's relevance objections to the police testimony and Dorsey's testimony relating to her asking the mother and the father about the cellphone and tablet they gave J.C., Jr. Counsel discounted such contentions because (1) the police testimony was relevant to whether domestic violence, one of the issues that brought the case to DCFS, had been addressed, and (2) Dorsey's testimony at issue was relevant to the allegation that the mother and the father failed to maintain a reasonable degree of responsibility as to J.C., Jr.'s welfare.

¶ 65 Counsel considered whether the finding that the mother was an unfit parent was against the manifest weight of the evidence, citing *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Counsel discounted such a contention, noting evidence that the mother did not complete all services and could not be recommended for unsupervised visitation.

¶ 66 Lastly, counsel considered whether the finding that terminating the mother's parental rights was in J.C., Jr.'s best interest was against the manifest weight of the evidence, citing *In re D.T.*, 212 Ill. 2d 347, 364-65 (2004). Counsel discounted such a contention, noting evidence that the grandmother's home was safe and appropriate, J.C., Jr. had a close relationship with the grandmother, and he wanted to stay with the grandmother and she wanted to adopt him.

¶ 67     Counsel mailed a copy of his motion and brief to the mother. This court informed her that she may file a written explanation of why she thinks there are meritorious issues in her appeal. She has not filed a response.

¶ 68     To comply with *Anders*, we have carefully examined the record and counsel's motion and brief. From our review, we agree with the conclusion that the mother has no issues of arguable merit on appeal. We grant the motion of the office of the Public Defender of Cook County for leave to withdraw as her appointed counsel.

¶ 69     Turning to the father's appeal, we must first determine whether the notice of appeal which was signed only by the mother confers appellate jurisdiction over his appeal.

¶ 70     The filing of a notice of appeal "is the jurisdictional step which initiates appellate review." *Village of Kirkland v. Kirkland Properties Holding Co.*, 2023 IL 128612, ¶ 38. Illinois Supreme Court Rule 303 (eff. Jul. 1, 2017) set forth the requirements for the contents of the notice of appeal and requires, in part, that the notice set forth the caption of the case, the judgment which is the subject of the appeal, the relief requested, and the name and address of each appellant or appellant's attorney. A notice of appeal is to be construed liberally. *In re Marriage of Arjmand*, 2024 IL 129155, ¶ 27.

¶ 71     Here, the notice of appeal is a preprinted form which was filled in by hand. In the caption, the appeal is titled "In the Interest of [J.C.,Jr.]," as a minor. In two places, the notice of appeal identifies the appellants as both the mother and the father, provides an address for the mother and the father and sets forth the termination hearing order of December 1, 2023 as the order being appealed, an order which applied to both the mother and the father and the relief requested as the reversal of that order. The notice complies with the requirements as to the contents of a notice of appeal under Rule 303 (Ill. S. Ct. R. 303 (eff. Jul. 1, 2017)) for the mother and the father.

¶ 72    As stated, the notice of appeal which had only a single signature line is signed by only the mother. In the past, Rule 303(b)(4) provided that the notice of appeal "shall contain the signature and address of each appellant or appellant's attorney." (Ill. S. Ct. R. 303(b)(4) (eff. Jan. 1, 2015)). We held, pursuant to this prior language, that where a notice of appeal states it has been taken on behalf of two persons, but only one of those persons signed their name thereto, we consider the appeal to have been taken only by the signatory to the notice of appeal. See *People v Krueger*, 146 Ill. App. 3d 530, 533 (1986). However, unlike prior versions of Rule 303, the current version of the rule does not require the appellants to sign the notice of appeal. See *Greenfield v Munoz*, 2021 IL App 200875-U, ¶ 17. In liberally construing the notice of appeal and because signatures were not required, we conclude that there is appellate jurisdiction over the father's appeal.

¶ 73    The father does not challenge the circuit court's findings that he is unfit to parent J.C., Jr. based on his failure to show responsibility, make reasonable efforts to correct the conditions which led to J.C., Jr.'s removal from his care and make reasonable progress toward reunification and has therefore forfeited review thereof. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 74    The father does challenge the finding that it is in the best interest of J.C., Jr. that his parental rights be terminated as against the manifest weight of the evidence. He further argues that his counsel was ineffective at the best interest hearing.

¶ 75    The evidence at the best interest hearing, which expressly included the evidence from the fitness hearing, by judicial notice, established that the grandmother has provided J.C., Jr. with a stable, supportive, and safe home for a prolonged period of time. There has been no abuse or neglect. The grandmother and J.C., Jr. have a loving bond and connection. His physical health and medical needs have been met. The grandmother has advocated for continued therapy to address changes in J.C.'s Jr. behavior when visitations were resumed with the mother and the father. J.C.,

Jr. is thriving and has done well academically. He is involved in outside activities and has relationships with his extended family, including with his godmother and uncles.

¶ 76   The grandmother desires to adopt J.C., Jr. and help him achieve his full potential. J.C., Jr. wants to stay with the grandmother. Although the mother and the father have had arguments with the grandmother while visiting with J.C., Jr. and they have been verbally abusive to the grandmother, she would be willing to allow a relationship and visits between with the mother and the father should J.C., Jr. wish to do so.

¶ 77   While J.C., Jr. was in a protective and nurturing environment with the grandmother, the father, on the other hand, continued to have a relationship with the mother which was marked by domestic violence, the very reason for J.C., Jr.'s removal from their care. The fighting occurred in various settings including in front of J.C., Jr. and during visits, therapy sessions, and DCFS appointments. Some of the incidents involved the police and resulted in physical injuries. The father never achieved unsupervised visitation with J.C., Jr. And for a period of time, the father's supervised visitations were suspended because of the fighting between the mother and the father and his refusal to reengage in a domestic violence program. When the goal was changed to TPR, the father was allowed to resume supervised visits, but his conduct upset J.C., Jr. and undermined the grandmother's relationship with J.C., Jr. The mother and the father gave J.C., Jr. a cell phone and tablet against the grandmother's wishes which caused further problems. The father did not complete the intact family services recommended in the IA.

¶ 78   Dorsey testified that after a staffing, the recommendation of DCFS was that parental rights be terminated and the goal changed to adoption. The rationale for the DCFS recommendation was that the grandmother had provided J.C., Jr. with stability for a period of years and the mother and the father had failed to progress with services for reunification.

¶ 79    We find that in light of the statutory factors and the evidence, the finding that it was in the best interest of J.C., Jr. to terminate the father's parental rights is not against the manifest weight of the evidence.

¶ 80    The father argues though that J.C., Jr. has a bond with him which the grandmother recognized when she preferred guardianship at the early stages of the case. The grandmother explained that as the case and time went on, she realized adoption was in J.C., Jr.'s best interest when the mother and the father continued to fight and argue and failed to complete services. In June of 2022, she concluded that adoption would provide J.C., Jr. with permanency and stability and has not wavered from that decision.

¶ 81    We also disagree with the father's arguments that adoption is not in J.C.'s best interest in that he has never directed his anger at J.C., Jr., the grandmother is not likely to allow visits with J.C., Jr. after adoption, and there is an insufficient backup plan for J.C.'s care. The record refutes these contentions.

¶ 82    The evidence shows that the father's abusive conduct has in fact threatened the well-being of J.C. Jr. who has undergone trauma-based therapy to address the impact of the domestic violence between the mother and the father. The continued domestic violence and the father's anger caused changes in J.C., Jr.'s behavior. He has lasting fears that the father will again hurt the mother. In one of their fights, he stepped in to protect the mother and the father pushed him aside. Although the grandmother has misgivings about the father and J.C., Jr. having continued contact, she testified that she understands the importance of a parental bond and would allow visitations if J.C., Jr. wished to do so. Finally, the grandmother testified that there are family members who would care for J.C., Jr. if she could not. There was no evidence or indication that the grandmother was

incapacitated or facing health or other issues which would prevent her from caring for J.C., Jr. on a permanent basis.

¶ 83    The father also argues that his counsel was ineffective for failing to cross-examine the witnesses or present evidence or a substantive closing argument at the best interest hearing. He asks that we reverse the termination hearing order as to the termination of his parental rights on this basis.

¶ 84    In a termination of parental rights proceeding, parents have a statutory right to counsel. 705 ILCS 405/1-5(1) (West 2016); *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 41. To adjudicate a parent's claim that he or she received ineffective assistance in a proceeding to terminate his or her parental rights, we apply the criteria found in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re R.G.*, 165 Ill. App. 3d 112, 127 (1988). In order to obtain relief under *Strickland*, a parent must prove that (1) the performance of counsel in a termination proceeding fell below an objective standard of reasonableness (*Strickland*, 466 U.S. at 687-88), and (2) this substandard performance caused defendant prejudice by creating a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different (*id.* at 694). Our supreme court has held that "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Furthermore, in a case under the Juvenile Court Act, both prongs of the *Strickland* test must be satisfied, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness. *In re Kh. M.*, 2023 IL App 230261, ¶ 42.

¶ 85    We review the father's ineffectiveness of counsel claim *de novo*. *Id*. His claim may be decided on the prejudice prong.

¶ 86    As a preliminary matter, the father citing *In re Leo M.*, 2022 IL App (5th) 190211, ¶ 76 maintains that prejudice should be presumed where his counsel failed to subject the State's case to

"meaningful adversarial testing." In *Leo M.*, the State obtained an order for involuntary administration of psychotropic drugs but failed to comply with several mandatory requirements of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 *et seq.* (West 2018)). *Id.* The hearing lasted 13 minutes and the violations of the Code were "flagrant." *Id.* ¶ 82. The appellate court reversed the order after finding that it failed to specify the dosage to be administered as required by the Code. *Id.* ¶ 40. Although this finding resolved the appeal, the court went on to address other claims of error, including other violations of the Code and the claim that the respondent's counsel was ineffective. *Id.* ¶¶ 42-82. As to the ineffectiveness of counsel issue, the court recognized that prejudice may be presumed where counsel does not hold the State to its burden of proof. *Id.* ¶ 76. However, the court found that the respondent was actually prejudiced by counsel's failures to challenge or object to the State's failures to comply with the Code, reasoning that had counsel raised these issues, the respondent would have had viable arguments for the denial of the State's petition. *Id.* ¶¶ 77-78.

¶ 87    Here, in contrast, the State complied with the requirements of the Juvenile Court Act and properly demonstrated that it was in J.C., Jr.'s best interest that the father's parental rights be terminated. At the best interest hearing, the State's witnesses were cross-examined by the GAL and the mother and the court itself asked questions. Their questions tested the State's claim that parental rights should be terminated and was in J.C.'s best interest. The father's attorney did not conduct cross-examination, present evidence, or extensive argument. However, the father had been found unfit, had not completed recommended services, continued to be involved in domestic violence and abusive behavior, and had never achieved unsupervised visitation with J.C., Jr. Further, J.C., Jr. had been in the grandmother's nurturing care for over four years. We do not believe that under these circumstances, there is a presumption of prejudice.

¶ 88    In the alternative, the father maintains that he was prejudiced by the ineffectiveness of his counsel because the finding that the termination of his parental rights was in the best interest of J.C., Jr. was against the manifest weight of the evidence based on his arguments on appeal. As we have found no merit in the father's arguments challenging the termination hearing order, we also find that he has failed to satisfy the prejudice prong of *Strickland* and reject his ineffectiveness of counsel claim.

¶ 89    For the reasons stated, we affirm the circuit court's termination hearing order which found the mother and the father unfit and terminated their parental rights.

¶ 90    Affirmed.